J-S62002-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

IN THE INTEREST OF: R.H., A MINOR

APPEAL OF: B.S., FATHER

: IN THE SUPERIOR COURT OF
:            PENNSYLVANIA
:
:
:
:
:
:
:
: No. 786 MDA 2017

Appeal from the Decree entered April 3, 2017
In the Court of Common Pleas of Mifflin County
Orphans' Court at No:  2016-00012

BEFORE:  STABILE, MOULTON, and STRASSBURGER*, JJ.

MEMORANDUM BY STABILE, J.:         **FILED OCTOBER 11, 2017**

B.S. ("Father") appeals from the decree entered April 3, 2017, in the Court of Common Pleas of Mifflin County, which involuntarily terminated his parental rights to his minor son, R.H. ("Child"), born in July 2014.[1]  After careful review, we affirm.

We summarize the relevant factual and procedural history of this matter as follows.  Child entered foster care on June 3, 2015, after Mother informed Mifflin County Social Services Agency ("the Agency") that she was unable to care for Child and his half-brother.  N.T., 12/12/16, at 62.  Child was adjudicated dependent by order dated June 22, 2015.  Petitioner's

_____

* Retired Senior Judge assigned to the Superior Court.

[1] The decree also terminated the parental rights of Child's mother, E.H. ("Mother").  Mother did not file a brief in connection with this appeal, nor did she file her own separate appeal.

Exhibit R.H. - 1 (Order of Adjudication – Child Dependent). At the time Child was adjudicated dependent, Father was incarcerated at Mifflin County Correctional Facility due to "drug charges as well as DUI and driving without a license." N.T., 12/12/16, at 67. Father received visits with Child while incarcerated, starting in July 2015. *Id.* at 30. However, Father's visits ended after he pled guilty to possession of a controlled substance and was transferred to State Correctional Institution – Smithfield ("SCI Smithfield") in December 2015. *Id.* at 32, 67. Father was released from SCI Smithfield on July 25, 2016, and then spent about three weeks in federal custody before entering a halfway house in August 2016.[2] *Id.* at 67, 133-34.

On September 27, 2016, the Agency filed a petition to involuntarily terminate Father's parental rights to Child. The orphans' court conducted a termination hearing on December 12, 2016. Following the hearing, on April 3, 2017, the court entered a decree terminating Father's parental rights.[3]

---

[2] The record indicates that Father will remain on state parole until November 2017, and will remain on federal parole until "a few months after November." N.T., 12/12/16, at 67, 150.

[3] It appears that the orphans' court waited to enter its termination decree until it could enter a single decree terminating both Father's and Mother's parental rights at the same time. Mother initially executed a consent to adoption form on December 12, 2016. However, Mother later filed a petition to revoke her consent on February 17, 2017, which the court granted on February 22, 2017. The court then scheduled an additional termination hearing as to Mother only on March 24, 2017.

We note that, prior to the hearing, on March 22, 2017, the Agency filed a motion to supplement the record, indicating that Father had been
*(Footnote Continued Next Page)*

Father timely filed a notice of appeal on May 2, 2017, along with a concise statement of errors complained of on appeal.

Father now raises the following issues, which we have reordered for purposes of our review.

> Question [1]: Did the [orphans'] court err in finding that there was clear, convincing and sufficient evidence establishing all elements of the statutory grounds alleged for the involuntary termination of Father's parental rights?
>
> Question [2]: Did the [orphans'] court err in ordering the termination of Father's parental rights as being in the best interest of the child and as best serving the needs and welfare of the child, where the record does not contain clear, convincing and sufficient evidence as to both the nature and strength of the father/child attachment and effects on the child of the severing of that attachment?

Father's Brief at 3 (orphans' court answers and suggested answers omitted).

We address these issues mindful of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law

_(Footnote Continued)_ ─────────────────

arrested once again and charged with a new criminal offense. The orphans' court entered an order indicating that it would consider the motion at the March 24, 2017 hearing. It is not clear from the record whether the court ultimately granted or denied the Agency's motion, because Father did not request that the March 24, 2017 hearing be transcribed, and because the court did not address the motion in its opinion or enter a subsequent order disposing of the motion.

or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the orphans' court terminated Father's parental rights pursuant to Section 2511(a)(2), (5), (8), and (b). We need only agree with the court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Here, we

analyze the court's decision to terminate under Section 2511(a)(2) and (b), which provides as follows.[4]

>**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>*** 
>
>(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
>*** 
>
>**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions

---

[4] We note that the orphans' court erred by concluding that Father's parental rights could be terminated under Sections 2511(a)(5) and (8). Both of these Sections require that the subject child have "been removed from the care of the parent by the court or under a voluntary agreement with an agency" in order to be applicable. 23 Pa.C.S.A. § 2511(a)(5), (8). Because Child was not removed from Father's care, his parental rights cannot be terminated under these Sections. *See In re C.S.*, 761 A.2d 1197, 1200 (Pa. Super. 2000) (*en banc*) (concluding that termination was inappropriate under Sections 2511(a)(5) and (8) "because the record reflects that C.S. was never in Appellant's care and, therefore, could not have been removed from his care.").

described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

We first address whether the orphans' court abused its discretion by terminating Father's parental rights pursuant to Section 2511(a)(2).

In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted). Importantly, "a parent's incarceration is relevant to the section (a)(2) analysis and, depending on the circumstances of the case, it may be dispositive of a parent's ability to provide the 'essential parental care, control or subsistence' that the section contemplates." *In re A.D.*, 93 A.3d 888, 897 (Pa. Super. 2014) (citation omitted).

Instantly, the orphans' court found that Father is incapable of parenting Child and that Father cannot remedy his parental incapacity in a timely manner. Orphans' Court Opinion, 4/3/17, at 9-10. The court reasoned that Father made no effort to maintain contact with Child after he

was transferred from Mifflin County Correctional Facility to SCI Smithfield in December 2015. *Id.* at 8-9. The court further reasoned that Father displayed a lack of interest in complying with court-ordered services, because he failed to complete a parenting program during Child's dependency, and because he participated in drug and alcohol treatment only as a condition of his parole, and only after the Agency filed a petition to terminate his parental rights. *Id.* at 9.

Father argues that he substantially completed the goals set forth for him in Child's permanency plan, and remedied his parental incapacity. Father's Brief at 12-13. Specifically, Father argues that he participated in drug and alcohol treatment programs, participated in a federal reentry program, cooperated with parole since being released from incarceration, and avoided any new criminal charges. *Id.* at 13. Father further argues that he demonstrated parenting skills during his visits with Child, that he took parenting classes in 2009, and that he has other sons who presently reside with him. *Id.* Finally, Father argues that he has housing and employment. *Id.*

Our review of the record supports the findings of the orphans' court. During the termination hearing, the court heard the testimony of Mother. Mother testified that she and Father separated in December 2013, before Child was born. N.T., 12/12/16, at 7. Mother testified that Father saw Child in person only once prior to his placement in foster care. *Id.* Specifically, Father came to visit Mother and Child when Child was "a few weeks old," in

approximately August 2014. *Id.* at 7, 20. Mother recalled that Father gave her thirty dollars, and asked for a paternity test. *Id.* at 7, 17. Mother filed for child support and obtained paternity testing. *Id.* at 11. However, Father was already incarcerated by the time Mother received confirmation of his paternity, and she never received any additional financial support. *Id.* at 10-11.

The orphans' court also heard the testimony of Gwen Steiner, Reunification Supervisor for Family Intervention Crisis Services ("FICS"). Ms. Steiner testified that FICS provided visits, parenting instruction, and counseling sessions for Father starting in July 2015, while he was incarcerated at Mifflin County Correctional Facility. *Id.* at 30-33, 36. As noted above, Ms. Steiner testified that Father's visits ended when he was transferred to SCI Smithfield in December 2015. *Id.* at 38. FICS did not provide visits to Father while he was incarcerated at SCI Smithfield, because he did not ask for visits, and because "[w]e also have to look at the well[-]being of the child and their age and what would be appropriate for them looking at the distance we're traveling to." *Id.* Even after his release from SCI Smithfield on July 25, 2016, Father did not contact FICS regarding visits.[5] *Id.* at 38-39.

_____

[5] Father testified that he was released on July 16, 2016, and spent about three weeks in federal custody before being released to a halfway house. N.T., 12/12/16, at 133-34.

- 8 -

In addition, the orphans' court heard the testimony of Agency caseworker, and Assistant Administrator, Nicole Patkalitsky. Ms. Patkalitsky testified that Father has a lengthy history of substance abuse, criminal activity, incarceration, unstable housing, financial instability, and inability to demonstrate proper parenting. *Id.* at 65-66. Based on this history, the Agency presented Father with a series of permanency plan goals. *Id.* at 65. These goals included participating in drug and alcohol counseling and parenting classes while incarcerated. *Id.* The goals also included refraining from illegal activity upon being released from incarceration, as well as demonstrating parenting skills, obtaining and maintaining stable housing and income, and cooperating with service providers. *Id.*

Concerning Father's progress in completing these goals, Ms. Patkalitsky testified that Father has only recently begun to cooperate with the Agency by providing information regarding his compliance. *Id.* at 96. Ms. Patkalitsky acknowledged that the Agency did not provide visits or services to Father after he was transferred to SCI Smithfield, because it is the Agency's policy not to provide visits or services to parents who are incarcerated in state prison. *Id.* at 88. However, she explained that Father did not request visits or services while at SCI Smithfield, nor did he contact the Agency in any way. *Id.* at 69-71, 101. After his transfer to SCI Smithfield in December 2015, Father failed to contact the Agency until at or near the time the termination petition was filed in September 2016. *Id.* at 69-70.

Thus, the record confirms that Father is incapable of parenting Child, and that he cannot remedy his parental incapacity. Father has a substantial criminal history, which has resulted in his being incarcerated for much of Child's life. At the time of the termination hearing, Father had only been released from state and federal custody for approximately four months, and it remained to be seen whether he would be able to maintain a crime-free lifestyle for any significant period of time. Moreover, Father has shown virtually no interest in Child. Prior to his incarceration at Mifflin County Correctional Facility, Father visited with Child only once. Although Father participated in visits with Child while incarcerated in Mifflin County, he made no effort to continue with visits or to maintain contact with the Agency after his transfer to SCI Smithfield. Father was transferred to SCI Smithfield in December 2015, and it was not until September 2016 that Father made contact with the Agency. As this Court has stated, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006).

Further, while Father argues that he substantially completed the goals set forth for him in Child's permanency plan, it was within the discretion of the orphans' court to reject Father's progress as insufficient. During the termination hearing, Father testified that he is participating in a federal

- 10 -

reentry program. N.T., 12/12/16, at 134, 146. Father also presented various certificates showing that he completed parenting and first aid programs while incarcerated in federal prison in 2009. *Id.* at 127-28, 151; Respondent's Exhibit 1. Father presented a certificate showing that he completed a "maturity into manhood program" entitled "Knights of the 21st Century" while incarcerated at Mifflin County Correctional Facility in April 2015, prior to Child's dependency. N.T., 12/12/16, at 130; Respondent's Exhibit 2. Finally, Father testified that he completed outpatient drug treatment at SCI Smithfield as a condition of his parole. N.T., 12/12/16, at 132. Father presented a letter showing that he has been participating in an additional outpatient program since October 2016, also as part of his parole. *Id.* at 136; Respondent's Exhibit 3. At best, Father's testimony demonstrates that he participates in services when he is forced to do so because of his criminal convictions, or when he simply has nothing else to do because he is incarcerated. These minimal efforts do not overcome Father's unresolved criminal history, and his lack of interest in Child.[6]

_____

[6] We also reject Father's argument that his alleged success in caring for his other children should prevent the termination of his parental rights with respect to Child. It is well-settled that "evidence concerning a parent's ability to care for another child is irrelevant and inadmissible in a proceeding to terminate parental rights with regard to the child at issue." *A.L.D.*, 797 A.2d at 338 (citations omitted).

We next consider whether the orphans' court abused its discretion by terminating Father's parental rights pursuant to Section 2511(b). We have discussed our analysis under Section 2511(b) as follows.

Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)) (quotation marks and citations omitted).

Here, the orphans' court found that terminating Father's parental rights would best serve Child's needs and welfare. Orphans' Court Opinion, 4/3/17, at 16. The court emphasized that Father's only significant contact with Child occurred between July 2015 and December 2015, and that Father

- 12 -

enjoyed only weekly one-hour supervised visits. *Id.* at 14. The court further emphasized that terminating Father's parental rights will allow Child to achieve a permanent, healthy, safe, and secure relationship with his foster parents, with whom he has lived for nearly his entire life, and will allow him to continue residing in the same foster home as his half-brother. *Id.* at 15-16.

Father argues that Child is bonded to him, and that the evidence does not support the conclusion of the orphans' court that no bond exists. Father's Brief at 8-9. Father argues that he was prevented from further developing his bond with Child because the Agency and the "Judges of Mifflin County" have a policy of not allowing children to visit their parents in state prison, and because the Agency did not offer him visits after his release from prison. *Id.* at 9-10.

We again discern no abuse of discretion. Regarding Child's relationship with Father, Ms. Steiner testified that she did not view any of their visits personally, but that she reviewed FICS records describing the visits. N.T., 12/12/16, at 47. Ms. Steiner testified that Child referred to Father as "Dahdah" during visits. *Id.* at 48. However, Child's reaction to Father was not always positive. *Id.* Child would sometimes go to Father for comfort, and would sometimes go to FICS staff. *Id.* Child would sometimes be happy to see Father, but other times would cry. *Id.* When asked if she saw any bonding between Father and Child, Ms. Steiner explained, "I think [Child] was at times comfortable going to him and playing with him. In

- 13 -

terms of when he needed to be comforted or soothed he was not always comfortable with that and would, also, go to staff and relied on staff for that." *Id.* at 56-57. Ms. Steiner further testified that Child refers to his foster parents as "mom and dad." *Id.* at 58. He appears to be comfortable and is adjusting very well in the foster home. *Id.* at 59.

Similarly, Ms. Patkalitsky testified that Child has no bond with Father, and instead is bonded with his foster parents. *Id.* at 71-72. She provided the following explanation.

> It would be my assessment that [Child] has not seen his biological father for almost a year, if not just a year. Um, he's two years old. He would not know who his father is. His mom and dad are the foster parents. That is who he calls mom and dad. That's who he looks to for everything a mom and dad would give to him. And I don't see how him being introduced to [Father] now would be beneficial to him.
>
> ***
>
> Like I said before, they[7] depend on the foster parents for everything a mom and dad do. Whenever [Child] gets up from a nap he goes straight to his foster mom and he calls her mom. If [A.], who is the foster dad, tries to walk out the door to go outside for something he's at the door wanting to go with dad. They are his parents.

*Id.*

Thus, the record confirms that terminating Father's parental rights will best serve Child's needs and welfare. Child has had minimal contact with

---

[7] As noted by the orphans' court, Child resides in the same foster home as his half-brother.

Father, and has not seen Father at all since December 2015. Child clearly does not share a parent/child bond with Father, and there is no indication in the record that Child would suffer any emotional distress if Father's parental rights are terminated. To the contrary, Child is bonded with his foster parents, and views them as his mother and father. By terminating Father's parental rights, the orphans' court will allow Child to achieve permanence and stability, and will allow Child to remain with his half-brother, who resides in the same foster home.

While Father argues that he was prevented from developing his relationship with Child because the Agency did not permit him to have visits at SCI Smithfield, the record is clear that Father failed to request visits, or to contact the Agency at all, during that time. Moreover, Father's incarceration was entirely his own doing. This Court will not delay permanence for Child because of Father's criminal behavior.

Based on the foregoing, we conclude that the orphans' court did not abuse its discretion by terminating Father's parental rights to Child involuntarily. Therefore, we affirm the court's April 3, 2017 decree.

Decree affirmed

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/11/2017